**Jake KING, Plaintiff,**

v.

**Cecil D. ANDRUS, Defendant.**

**Civ. A. No. 2030–72.**

United States District Court, District of Columbia.

Dec. 30, 1977.

---

**12**

Daniel A. Rezneck, Linda D. Fienberg, Washington, D. C., for plaintiff.

Alexis Panagakos, Royce C. Lamberth, Jr., C. Brewster Chapman, Jr., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

BRYANT, Chief Judge.

Plaintiff, an American citizen living in American Samoa, had been charged in the High Court of American Samoa with willful failure to pay Samoan income tax and to file an income tax return in violation of pertinent sections of the United States Internal Revenue Code of 1954, as adopted by the Revised Code of American Samoa. The Chief Justice of the above-mentioned court denied plaintiff's motion for a jury trial, and plaintiff filed this suit against the Secretary of the Interior as administrator of American Samoa requesting, (1) a declaration that the denial of jury trial to an American citizen charged with serious crime in the American Samoan court is unconstitutional; and (2) an injunction against the Secretary's enforcement of any judgment of conviction against him not based on a jury verdict.

After cross-motions for summary judgment were filed, this court dismissed the action for lack of jurisdiction. Plaintiff appealed, and our U.S. Court of Appeals, noting probable jurisdiction, reversed and remanded with directions to this court to render a decision which rests on a solid understanding of the present legal and cultural development of American Samoa. The Court stated:

"That understanding cannot be based on unsubstantiated opinion; it must be based on facts.

"Specifically, it must be determined whether the Samoan mores and *matai* culture with its strict societal distinctions will accommodate a jury system in which a defendant is tried before his peers; whether a jury in Samoa could fairly determine the facts of a case in accordance with the instructions of the court without being unduly influenced by customs and traditions of which the criminal law takes no notice; and whether the implementation of a jury system would be practicable. In short, the question is whether in American Samoa 'circumstances are such that trial by jury would be impractical and anomalous.' " *King v. Morton*, 172 U.S.App.D.C. 126, 133, 520 F.2d 1140, 1147 (1975).

Pursuant to these directions, an extensive trial was held.

It appears that plaintiff is correct in his contention that the jurisdictional issue has been resolved in his favor by the Act of Congress (Public Law 94–574, 90 Stat. 2721) amending 28 U.S.C. § 1331 which eliminates the required showing of a value of $10,000 of the matter of controversy; and also by *Ralpho v. Bell*, 569 F.2d 607, decided by our Court of Appeals on March 29, 1977. The defendant does not seriously contend otherwise.

Throughout these proceedings the defendant has contended that instituting jury trial as a requirement of the criminal justice system in American Samoa would be impractical and anomalous within its culture, and that it would undercut the preservation of traditional values and harmonious

relationships on the relatively small island and undermine confidence in the present system of justice.

Defendant claims that "Fa'a Samoa" (the Samoan way of life) encompasses a complex system of personal interrelationships manifestly adverse to a jury system. The main features of this system are the "aiga" or extended family, the "matai" or chieftal system, the land tenure system under which nearly all land is communally owned, and the custom of "ifoga" whereby one family renders formal apology to another for a serious offense committed by one of its members.

The smallest social unit is the *au aiga* or household which consists of a group of relatives living together in a particular area, and numbering between five and perhaps thirty-five persons, ranging from sons and daughters to in-laws, cousins and adopted persons.

At the head of the *au aiga* is a *matai* or chief who is selected by the members of the household to manage the land and their daily affairs.

The defendant presents the *aiga* as a commonly used relationship grouping, which in one context would include various clans under a particular family name, thus numbering hundreds of people who are all conscious of strong family ties, and who in effect form a close-knit group, under a single *matai*. This represents the so-called extended family concept.

This accounts for a different level, or higher ranking *matais* who control the assignment of land to the various families of the larger family or clan. In addition to this authority, the *matais* also direct much of the social and religious life of their families in the districts and at the village level. *Matais* are respected and have some influence over their family members.

Finally, the defendant emphasizes a "sense of oneness" on the part of American Samoans arising out of the almost endless family relationships and the smallness of the area. He alleges that everyone is familiar with almost everyone else, and that

not only do Samoans feel strong loyalties to the members of their *aiga*, they also feel a strong loyalty and bond with all Samoans.

The defendant contends that in the light of these features of the Samoan way of life no jury of impartial persons could be empaneled. He reasons that Samoans would not be truthful on *voir dire* about relationships to parties in a trial; that lawyers would not exercise challenges against prospective jurors for fear of offending *matai* of their families or other families; that Samoans would not convict a *matai* of a crime because of repercussions which would follow the family relationships; and that *matais* would influence the vote of jurors. And finally, he seriously urges that if an *ifoga* were accepted by the family of a victim of the crime no jury would convict an accused.

Predictably, plaintiff discounts the current force and effect of these cultural phenomena insofar as they might doom an effective jury system in criminal proceedings, and extolls certain aspects of American Samoa's background and development which he claims are entirely compatible with the institution of jury trial.

The evidence supporting plaintiff's position is overwhelming—most of it coming from the defendant's own witnesses.

*The Aiga.*

There are as many *aiga* in American Samoa as there are *matais*, and these number well over a thousand. While many *aiga* are substantial in size, there are many more with as few as twelve members.

Many of the people considered part of an *aiga* are rather distant relatives who do not live in geographical proximity; and oftentimes people do not know on an individual basis who are related to other people. The strength of the *aiga* concept has been further diluted by several factors in modern Samoa. In the last 50 years the population has increased from 8000 to about 30,000. This increase in population has brought a corresponding increase in the number of individual households—from about 2600 in 1960 to 6,000 in 1975, and a decrease in the number of persons in each household (7 in 1960 to 4 in 1975). The *aiga* has also lost

ground in the face of widespread intermarriage of American Samoans with Americans and others.

Moreover, if the defendant's contention in regard to the effects of the *aiga* were valid, they most certainly would have come alive in other aspects of the system of justice. But they are conspicuously absent. For example, American Samoans testify against members of their own *aiga* in the Land and Titles Division of the High Court—after taking the traditional oath as we know it. Then again, all judges in the Traffic Division and the Land and Titles Division of the High Court are Samoans.

As for the criminal side, the 95-member Samoan Police Department, except for the Chief of Police, consists of Samoans. According to the evidence, these officers have no reluctance when it comes to arresting fellow Samoans and charging them with offenses which carry jail terms. In the great majority of the criminal cases witnesses are Samoans who testify on both sides in the cases, and there is no indication that they display any reluctance in this regard.

The lawyers-prosecutors and defense counsel alike are Samoan and apparently represent their respective clients vigorously, with an eye to duty rather than family relationships. Testimony adduced at the trial certainly does not support any notion that these lawyers are handicapped in the performance of their duties by any family ties. As a matter of fact, one of the defendant's witnesses, High Chief Tuiteleleapaga, at one time held the position of prosecutor and special assistant to the Attorney General. In that capacity he handled criminal cases. He was so objective in performing his duty that he convicted his brother's son of a criminal offense and recommended that he be jailed for three months. Finally, in this system we have the advisory judges who perform openly during the trial. The evidence establishes that Samoans are readily available for this duty.

*The Matai System.*

It has been noted that there are various rankings among *matai* titles, carrying different degrees of authority and influence. Basically their authority stems from their control over who works the land, and where. Because of various economic and social changes it is generally conceded that the influence of the *matai* system has been declining, and is continuing to do so.

It appears that there is less subsistence agriculture, and the pattern of families working communally owned land has broken down considerably. Now households include distant relatives who for one reason or another have come from remote areas. Though the chief they live with is a relative, he is not the one to whom they are primarily loyal, and his control over their behavior is minimal.

The monopoly on political expression for a family once held by the *matai* has given way to the right to vote of all adults for representatives in the general elections. Apparently the economic foundation on which the power of the *matai* is based, i. e., control of persons living and farming on the communal land, has eroded in the face of western world encroachment. A defense witness, Mrs. Van Cleave, attributes this in large measure to influence of the U. S. military in World War II which introduced the Samoans to a wage economy hitherto unknown to them. According to this witness the Samoans found the wage economy more attractive than the bartering system, and very few dollars are passed on to the *matai*. With the wage economy came the notion of personal property; and as Delegate Lutali put it, the Samoans, particularly the young couples, have houses, cars, television sets, and other personal items, along with the education of their children to pay for, and are thus more concerned with these obligations than with rendering service to a *matai*.

The alleged widespread influence of the *matai* system is further weakened by the fact that a great number of people in American Samoa live wholly outside that system. There are many persons from the United States and other countries in business and professional activities, and there is

evidence that many Samoans who have returned from the United States have simply chosen to live outside the system.

Significantly, all of the *matais* who were witnesses in this case emphatically denied that they would attempt to influence a juror verdict. And they point out that *matais* have not attempted to control the voting of their families in current elections.

The *Ifoga* custom.

Apparently the *ifoga* is becoming a thing of the past. One witness (a chief) has observed four in thirty-five years. Another chief was involved in one *ifoga* in a period of seventeen years. Yet another witness who has been a *matai* eighteen years has never participated in such an affair. And the Samoan delegate to the United States remembers his last *ifoga* as an occurrence long before World War II.

The evidence clearly established that traditionally the *ifoga* applies only to certain kinds of offenses between Samoans, i. e. in cases of bodily harm inflicted by a member of one Samoan family against a member of another family. *Ifogas* were not involved in minor offenses. Obviously *ifogas* served no purpose in cases involving crimes against the government and offenses involving non-Samoans.

The sole purpose of the *ifoga* is to bring peace between families. It is not designed to punish or protect the perpetrator. There is no indication that the *ifoga* custom has interfered with the operation of the criminal justice system, either in American Samoa, or Western Samoa where convictions are determined in nearly all cases even though the fact-finders are a panel of Samoan "assessors".

Thus it appears that the three main props to the defendant's contention of substantial cultural differences that make jury trial impractical and anomalous are too weak to support it. No showing has been made to this court that proper exercise of the *voir dire* and challenges to particular jurors do not constitute an effective prophylactic against the undesirable effects of any one or all of those cultural differences on the operation of a jury trial.

The obviously major cultural difference between the United States and American Samoa is that land is held communally in Samoa. The jury trial requirement in criminal proceedings would have no foreseeable impact on that system.

Against the waning influence of those facets of American Samoan culture which make the defendant apprehensive about the feasibility of trial by jury, plaintiff aligns several aspects of social and political development which are clearly supportive to his position.

Plaintiff correctly points out that the jury system is widely recognized as an institution of democratic government, providing the people with an opportunity to participate in the judicial system and make important decisions affecting their fellow citizens. The evidence establishes that the Samoan culture has many democratic features that permit, and in fact, foster, widespread popular participation in the conduct of public affairs. For example, the *matais* are selected via a democratic process. They are elected by the members of their families, or clans, whom they will govern. The titles are not hereditary.

If a *matai* does not perform his duties he may be removed. This too is accomplished by majority vote of the family or clan, or *aiga* (the extended family). These procedures are characterized by full and free discussion during which, if possible, unanimous consent of the family is sought.

The institutions of the present government of American Samoa reflect not only the democratic tradition, but also the apparent adaptability and flexibility of the Samoan society. It has accommodated and assimilated virtually *in toto* the American way of life.

The present governmental structure is based upon the American. It is divided into three branches, executive, legislative and judicial. The legislative branch (Fono) has two houses, the House and the Senate. The legislature conducts its business in the same way as the American legislature by the introduction of bills, committee hearings, floor debates, final vote of the legislature and finally, submission to the governor.

The lower levels of government also track that of American state and local government. There are, for example, boards and commissions which, as in America, regulate and control alcoholic beverages, zoning, paroles and pardons, and even boxing. And a criminal justice planning agency receives funds from our own Law Enforcement Assistance Administration.

American Samoa has its Constitution with a Bill of Rights. The latter contains all of the procedural protections of our own Constitution for criminal defendants except the grand and petit jury requirements. These include protection against unlawful search and seizures, the exclusionary rule against the admission of illegally seized evidence, the protection against double jeopardy, the privilege against self-incrimination, the right of cross-examination and confrontation, the presumption of innocence, the right to bail, and the right to the assistance of counsel, and the time honored writ of habeas corpus. According to a defense witness, Justice Jochimsen, there has been no difficulty in administering the system of criminal justice which is similar to our own in so many respects.

The High Court of American Samoa follows the American system of trial. It is an adversary system with a prosecuting attorney on one side and defense counsel on the other; witnesses testify under oath and are cross-examined. The Federal Rules of Criminal Procedure apply fully except for the jury trial provision. And finally the Samoan substantive law is a virtual transplant of the American. Title 15 of the Code of American Samoa defines the basic crimes and virtually all of them are derived from our Title 18. As a matter of fact the Federal Internal Revenue Code is incorporated by reference into the law of American Samoa, including the specific provisions under which the plaintiff was prosecuted.

The correlation of educational levels and the viability of democratic institutions is for the most part undisputed, and specific relationship between education and an effective jury system was recognized by virtually every person who testified in this case. All agreed that educational advances in American Samoa during the last ten or fifteen years have been extraordinary. School attendance is compulsory through age 18 or graduation from high school, and there is an increasing emphasis on higher education. A community college, opened in 1971, is well attended, and since 1972 has graduated between 100 and 130 persons annually. In addition, a substantial number of American Samoans have been educated in schools in the United States. Some have returned with law degrees and master's degrees.

Also, in 1964 American Samoa pioneered in the use of educational television. The main thrust of this project is the teaching of English in the primary and secondary schools, but it is also used for adult education programming. Bilingual persons are commonplace, and almost all American Samoans can read and write in Samoan. When needed, interpreters are readily available.

From a logistical and administrative point of view, the jury system in American Samoa is entirely feasible. The evidence indicates that there are about 7,000 registered voters with the vast majority of them situated on the main island of Tutuila where the courthouse is located. Available transportation eliminates any problem of access to the courthouse. A roll of registered voters is maintained by the election department of the government and this should provide an adequate pool of prospective jurors who are most likely to be literate and educated.

Caseload statistics in the High Court of American Samoa indicate that jury trial would not overtax the judicial system. In fiscal 1975 there were only 165 criminal filings, and most of these, as is the case in the United States, did not result in trial, but were disposed of by way of the plea bargaining route. No evidence was offered to the effect that the rate of dispositions by pleas would be appreciably affected by the introduction of a jury trial.

The present court system of American Samoa is already handling effectively any problems arising out of the bilingual nature of the society. Interpreters provide simultaneous translation in both civil and criminal cases which are tried in the High Court.

The questions are put in English and translated into Samoan. Witnesses answer in whatever language they choose and the responses are immediately translated. Colloquy between the court which is in English is translated into Samoan for the benefit of the Samoan associate judges. Nothing in the evidence points to the fact that this translation system would not function as well in jury proceedings as it does presently in trials before the court. A similar system of translation is in current use in Western Samoa which has the same two official languages, English and Samoan, as American Samoa.

Finally, the evidence established that the personnel and officers which would make a jury system work effectively are already present in American Samoa, i. e., professional prosecutors, a public defender office, and a number of American Samoan defense attorneys who are graduates of American law schools and are trained in the American judicial system.

One final word. The witnesses, both for the plaintiff and the defendant, agree that jury trial would be a desirable feature of American Samoa's criminal justice system. The only points of difference arise with the questions of when should it be instituted, and by whom. I wish to emphasize that I have great sensitivity to the views expressed by most of the witnesses that these questions should be resolved by American Samoans themselves. On its face this position has considerable appeal.

However, the many expressions of this point of view do not of themselves establish dispositively the impracticality or anomaly of a jury trial in serious criminal proceedings in American Samoa at this time. I am required at this juncture to consider, as best I can, all of the circumstances bearing on this issue. The fact is that all of the hard evidence which bears on the actual situation in American Samoa today in terms of its legal and cultural development cuts the other way, and leads me to the inescapable conclusion that trial by jury in American Samoa as of the time when Jake King went to trial on the criminal charges here involved would not have been, and is not now, "impractical and anomalous".

Accordingly, plaintiff is entitled to the relief prayed for. Therefore this court (1) concludes that the provisions of the Revised Code of American Samoa, the Rules of the High Court of American Samoa, and the rules and regulations of the Secretary of the Interior, which deny the right of trial by jury in criminal cases in American Samoa are unconstitutional on their face and as applied to plaintiff, and that the defendant, his appointees, agents, employees, and all other persons subject to his authority and control cannot lawfully enforce these provisions or act pursuant to them; and (2) permanently enjoins the defendant, his appointees, agents, employees, and all other persons subject to his authority and control from enforcing any judgment of criminal conviction against plaintiff obtained without according him a right to trial by jury.