CECIL FAIRHOLT, et. al., Plaintiffs,
v.
HIGH TALKING CHIEF AULAVA MUA'AU, et. al., Defendants.

High Court of American Samoa
Land and Titles Division

LT No. 6-83

March 7, 1983

GARDNER, Chief Justice.

In this case we are asked to determine the constitutionality of section 43.1309 ASCA, which provides in part that only the Sa'o of a Samoan family is authorized to bring an action for an injunction in matters pertaining to communal land within his own family.

Plaintiffs, members of the family, have brought an action against the Sa'o on a matter concerning communal land. At this stage we know nothing of, nor are we concerned with, the merits of the case. Defendants have filed a motion to dismiss the complaint under this section. If the section passes constitutional muster, the action must be dismissed. If not, we will, at a later time, hear the case on its merits.

As we said in our preliminary ruling, the wisdom or folly of this legislation is of no concern to the court. It may be wise. It may be foolish. It may be "good." It may be "bad." The court can intervene only if the legislation is in clear violation of a specific constitutional provision.

Again, as we said in our preliminary ruling, this statute is clearly unconstitutional by statewise standards.

It is in violation of the U.S. Constitution in two respects.

First, it violates the due process clauses of the fifth and fourteenth amendments which provide that no one may be deprived of life, liberty, or property without due process of law. While due process is an elusive concept, unquestioned are the rights to notice and an opportunity to be heard. This section denies family members other than the Sa'o an opportunity to be heard on matters concerning communal land. To them the courthouse door is closed.

Second, it is clearly in violation of the equal protection of the laws provision of the fourteenth amendment since it denies equal protection of the law to those similarly situated. The Sa'o can bring an action concerning family lands. Individual family members cannot.

While the Constitution of American Samoa contains no equal protection provision (probably in deference to the matai system) it does contain a due process clause (article I, section 2): "No person shall be deprived of life, liberty, or property without due process of law."[1]

We reject Defendants' contention that the unquestioned right of a family member to use communal land is not a property right under the due process clause of either the U.S. or Samoan constitutions. As the witness, attorney Michael Kruse, said, the right of a family member is a conditional entitlement to ownership no greater than that of another family member. This is a property right. Applying common law principles of private

---

1. The Constitution of American Samoa contains a provision not found in the U.S. Constitution. Article I, section 4 provides that the dignity of the individual shall be respected. This sounds much like John Kneubuhl's definition of Fa'a Samoa. Mr. Kneubuhl testified that the essence of Fa'a Samoa was respect for one's fellow man. Other than this footnote we will avoid use of the phrase "Fa'a Samoa" as being incapable of . definition. No two witnesses could agree on the meaning of the expression and we lack the effrontrey to attempt our own definition. The concept is a elusive as the Holy Grail. Instead, we use the expression "the Samoan way of life" since that is the expression used in the Constitution of American Samoa (Article I, section 3).

ownershipof property in such a way as to deprive a Samoan of a constitutional right is simply unacceptable. As we will observe later, when the U.S. accepted this Territory it not only quaranteed the Samoan way of life, it also granted Samoans certain basic fundamental protections under the U.S. Constitution. We will not tolerate divesting a Samoan of his constitutional rights on such hair-splitting property distinctions. (It should be noted that equal protection pertains only to "persons," not property. In .an equal protection context property principles are academic.)

We also reject the contention that the due process clauses of the U.S. Constitution do not apply to communal land because the concept of communal land was unknown when those amendments were drafted and ratified. A constitution is a living, dynamic, vital document which, to be viable, must be capable of adjustment and adaption to new and challenging· circumstances. If a constitutional provision onl spoke as of the day of ratification, a constitution would become, instead of a charter for the future, a moribund document which looks only to the past. The development of the U.S. Constitution under court interpretation to meet new and sometimes unexpected, or even unanticipated, developments belies this type of interpretation.

We also reject the testimony of the witness Salanoa that the due process clause of the American Samoa Constitution applies only to individually owned land. If the authors of that amendment had so meant they would have said that no person shall be deprived of life, liberty, or indiviually owned land without due process of law. "Property" obviously includes communal land, freehold land, individually owned land, and personal property of all kinds, types, natures, and descriptions. It is inconceivable that the authors of the American Samoa Constitution meant only to protect the owners of the 2 per cent of the land who hold their property in a status not recognized by the statutes of the Territory and which is becoming a matter of some Judicial questioning (See Justice Murphy's discussion of individually owned land in Leuma v. Willis, LT No. 47-79 (1980)).

The American Samoa Constitution applies to communal land.

Clearly Samoans are entitled to basic or fundamental rights under the U.S. Constitution. Included within these fundamental rights are due process and equal protection of the law. Craddick v. Territorial Registrar, AP No. 10-79 (1980); King v. Morton, 520 F.2d 1140; King v. Andrus, 452 F.Supp. 11. See also Laughlin, The Application of the Constitution in U.S. Territories, 2 Hawaii L. Rev. 337; Harriman, The Impact of King v. Andrus, 5 Samoan Pac. L. J. 30; McBride, The Application of the American Constitution to American Samoa, 9 J. Intl. Law & Econ. 325. Equally clearly, Samoans are entitled to due process under the American Samoa Constitution.

Actually, this whole discussion is somewhat academic. The Apellate division of this court in Craddick, supra, held that the constitutional guarantees of due process and equal protection contained in the U.S. Constitution and the American Samoa Constitution are fundamental rights which apply to the Territory of American Samoa. Under elementary principles of stare decisis this court, as a trial court, must follow the holding of the Apellate court. And that, to coin a phrase, is that. If the Defendants are unhappy with this holding their only recourse is to the Appellate division.

Insofar as due process is concerned, if a staatute denies a citizen of American Samoa due process of law under either the U.S. or the Samoan constitution it is unconstitutional.

Insofar as equal protection of the laws is concerned, we must adress another issue.

Access to the courts is a fundamental right. Thus, the classification created by this section between a Sa'o and a non-Sa'o becomes a so-called suspect classification because it denies a non-Sa'o access to the courts.

The United States Supreme Court had adopted a "two-tier" test of classifications. McDonald v. Board of Education, 394 U.S. 802; Koremaster v. U.S., 323 U.S. 214. In ordinary equal protection cases not involving suspect classifications or the alleged infringement of a fundamental interest, the classification is upheld it if bears a rational relationship to a legitimate purpose. But if a statutory scheme imposes a suspect classification, such as one based on race, or a classification which infringes on a fundamental interest, such as the right to pursue a lawful occupation or the right to vote or access to the courts, the classification must be closely scrutiniaed and may be upheld only if it is necessary for the furtherence of a compelling state interest.

Defendants invite our attention to the case of Morton v. Mancari, 417 U.S. 535, in which the court recognized the "unique legal status" of American Indians and determined that the complained of racial discrimination was not really a racial discrimination but a "preference" which was "reasonably and directly related to a legitimate non-racially based goal."

While all of this may appear to be a futile exercise in Judicial rhetoric, we will, in an attempt to be fair to all, apply each test to this legislation--furtherence of a compelling state interest, rational basis, and reasonable and direct relation to a legitimate goal.

While not expressed in so may words, the treaties by which Eastern Samoa became a part of the United States of America have been interpreted as guaranteeing the Samoan way of life.

The 1890 Treaty of Berlin, while providing generally for the protection in Samoa of the subjects of the Governments involved--Great Britain, Germany, and the United States--forbade land alienation by natives and guaranteed the free right of the natives to choose their form of governement "according to their own laws and customs."

The cession of Tutuila in 1900 provided that the U.S. would respect and protect the individual rights of all the people dwelling in Tutuila to their lands and properties and that the chiefs of the towns were entitled to retain their individual control of the towns.

The cession of Manu'a four years later was more specific. It provided that the rights of the chiefs of the villages and of all the people concerning their property "according to their customs" shall be recognized.

The Constitution of American Samoa (art. I, sec. 3) provides that it is the policy of the government of this Territory to protect persons of Samoan ancestry against destruction of the Samoan way of life and language, contrary to their own best interests, and that the legislature shall enact such legislation as may be necessary to protect the lands, customs, culture, and traditional Samoan family organization of persons of Samoan ancestry.

The message is clear. The Samoan way of life must be protected. The issue is whether the statute involved in this case is necessary to carry out this mandate.

In support of this statute the Defendant called the hierarchy of the Matai system in American Samoa today—High Talking Chief Aulava; Paramount Chief, District Governor of the Western District, and former Chief Associate Judge Lualemaga; High Talking Chief and Senator Tuilefano; Manu'a District Governor and High Talking Chief Laolagi; High Talking Chief and former Chief Associate Judge Masaniai; Paramount Chief and former Associate Judge Misa; High Talking Chief Laie; High Talking Chief and District Governor of the Eastern District Faumunina.

Without exception these witnesses testified this legislation was necessary to protect the Samoan way of life. Without it said Aulava, the culture will collapse. Laie said the system will be demolished. Lualemaga said the custom will collapse and fade away. All felt that the concept of a family member suing a Sa'o was a disgrace to that Sa'o's reputation, an ambarassment to the Sa'o, and an expression of contempt or disrespect for the Sa'o. All felt that generally Sa'os made wise, just, fair decisions. None thought a family member should sue a Sa'o.

Seldom has a court been confronted with such an array of witnesses. No one could doubt the sincerity and the honesty of the testimony they gave or of the unquestioned integrity of the men themselves. These were some of the leading citizens of the Territory, uniformly proud, serious, strong-minded, and commanding. When one observes this kind of leadership it is no wonder that the Matai system exists as a strong and viable concept. Whether their sincerely expressed concern for this statute has a sound basis in fact is the question.

The first witness for the Plaintiffs was John Kneubuhl, Professor of Samoan History and Culture at the local Community College. Mr. Kneubuhl was born in American Samoa and is of three-eighths Samoan blood. Professor Kneubuhl traced the 3000 year history of the Samoan culture and pointed out numerous "profound changes" in that culture, among them being the advent of Christianity in the 1800's and the most recent adoption by the Territory of so-called democratic principles of Government with a popularly elected Governor, Lieutenant Governor, and House of Representatives together with statutorily authorized court selection of Matais when the family cannot agree. In Mr. Kneubuhl's opinion the Samoan way of life is dynamic, not static, the essence of the Samoan way of life is respect for one's fellow man and allowing a family member to go to court to question a decision made by a matai won't hurt the system a bit. The matai is not a substitute for the family, he is the family voice. That voice may be questioned by an individual family member without endangering the system.

High Talking Chief Pao Paoailua reallu didn't care whether a family member questioned his decision. If the family member wanted to sue, Pao Paoailua would say "Whatever you want to do." However, he did think this was a good law and one necessary to protect the system.

High Chief Lutali's credentials as a leader in the community could not be questioned--a legal practitioner, President of the American Samoa Bar Association, former Chief Associate Judge of the High Court, former President of the Senate, former Speaker of the House, and Chairman of the 1967 and 1973 Constitutional Revision Commission. Chief Lutali opined that this law was not necessary to protect the Samoan way of life. He pointed out that the Territory has gotten along without such a law for over 80 years. He felt that a member of the family should have a right to go to court to protect himself against arbitrary or capricious actions on the part of the Sa'o. Failing this recourse a Sa'o could actually deprive a family member of the use of family land which would be in violation of the Samoan way of life. He felt that when the Samoans accepted the American Governmental system it accepted all three branches--Legislature, Executive, and Judicial, and that all Samoans should have access to the courts regardless of title.

Albert Mailo, non-titled attorney, agreed. He testified that the matai system works and that the vast majority of matai decisions are fair, just, honest, and accepted by the whole family. He pointed out that the law was simply not necessary. He said that such suits were a rarity, that he only knew of 3 or 4 and that there had probably not been more than 10 such cases in the history of the Court.

Michael Kruse, attorney, agreed. He felt that the section was good law as to lawsuits between families but presented serious constitutional problems if applied within the family. He too felt that a family member should have a right to judicial review of the decision of a Sa'o and that this could be done without damage to the system.

High Chief Salanoa, a man with credentials in Government services comparable to those of Chief Lutali was the last witness called, being called as a rebuttal witness by the Defendants. A legal practitioner, a long time member of both Houses of the Legislature, a member of the Constitutional Commissions, Chief Salanoa is currently the Governor's Liason Officer with the Legislature. Unhappily for the Defendants, Chief Salanoa was an unmitigated disaster to their cause. (It is to be remembered that it was Chief Salanoa who testified that the due process provision of the American Samoan Constitution ony applied to individually owned land.)

Chief Salanoa's testimony pointed out with crystal clarity the vice of this section.

All witnesses were in agreement that the vast majority of Sa'os carry out their duties responsibly and make family decisions that are fair, wise, and just. Nevertheless, human experience tells us that all human beings are not perfect and, applying that concept to this situation, it is not inconceivable that some Sa'os are capable of making a mistake. This principle seemed so obvious that it had been explored with only two witnesses, Chief Lualemaga and Chief Laolagi. Each conceded that a Sa'o could be in error and that a family member should have recourse to the courts but only after a good faith attempt to work the matter out with the matai and the family. Nevertheless, for the overall good of the system they felt that the law was necessary for the protection of the Samoan way of life.

Not Chief Salanoa. He simply refused to concede that a Sa'p could ever be wrong. This "King can do no wrong" attitude went out first with the

Magna Carta and eventually with the French Revolution and the demise of the concept of absolute monarch.

As indicated, Chief Salanoa's testimony pointed up the vice of this statute. There may be Sa'os who share Chief Salanoa's attitude that nothing they do can be arbitrary, capricious, or even illegal. As long as that attitude exists, recourse to the courts would appear to be mandated.

In this respect, we accept, without reservation, the suggestions of Chief Lualemaga and Chief Laolagi that no family memmber should be allowed access to the courts until a good faith effort has been maed to settle the problem with the Sa'o and within the family. We will rule that as a condition presedent to bringing an action against a Sa'o or other family member, the family member must plead and prove a good faith effort to consult with the Sa'o and the family. This is the Samoan way of life— discusssions, discussions, and discussions in a good faith effort to iron out disputes. We decline to establish a presedent by which any malcontent family member can willy nilly run to court every time a Sa'o makes a family decision with which he disagrees. We have already observed that all Sa'os are not perfect. Neither are all family members.

What is the "Samoan way of life" this statute is supposed to protect?

Briefly, the Samoan way of life has twin conerstones, the matai system and communal land tenure. (See Lutali and Williams, Legal Aspects of the Matai and Land Tenure Systems in the Territory of American Samoa, 2 Samoan Pac. L. J. 110.) The family owns the land. The rights of the individual family members defy common law labels. Attorney Michael Kruse probably said it as well as it can be said, a conditional entitlement to ownership no greater than any other family member. The mataiis selected by and speaks and acts for the family. His pule (authority) is titular. He has no greater right in the family than any other member of the family. There was general agreement in this case that he acts as a trustee of communaly lands.

And so, at long last we ask ourselves, does the right of a family member to question in court a decision by a Sa'o in regard to communal land damage the Matai system? It does not. Our reasons for this conclusion:

1. It is obvious that the Matai system is alive and well in American Samoa. the matais are carefully selected by the families. Their decisions are generally accepted by the families as wise, good, and just. The respect in which matais are held is reflected by the fact that almost all elected governmental offices are held by matais—the Governor, the Lieutenant Governor, the majority of the House of Representatives—all elected by popular vote. The Matai system is robust, healthy, and in need of no false support.

2. Since 1900 only about once a year has a family member even questioned a matai decision in court. From this history it is hard to conceive of any pressing necessity for such a law.

3. From this history, in no way can any rational person expect the collapse of the system should we return to the pre-1981 and pre-section 43.1309 days. The system survived those days. It will survive into the future. The Samoan way of life has shown that it can accomidate itself to change. Samoan culture is dynamic, energetic, forceful, and vigorous. The filing of a lawsuit by a family member against a Matai is not going to destroy the system.

4. A few matais may have their feelings ruffled when a family member sues. So, too, a few judges become irate when

someone appeals their wise, just, and fair decisions. Both Matai and Judge will survive and neither the Matai system nor the judicial system will suffer irreparable harm if someone questions the decisions of Judges or Matais.

5. Samoans enjoy more protections than anyone simnilarly situated. They are protected not only by the U.S. Constitution and the Constitution of American Samoa but by various treaties. It would be unconscionable to deprive persons so protected access to the courts. While the family is important, so too are the individual members of the family. The Constitution of American Samoa specifically recognizes the dignity of the individual.

6. A matai is not a king. He is the first among equals. His equals have the right to question his actions—even in court. This does no damage to the system.

7. Section 43.1309 is an attempt to freeze the system into a status which may have existed hundreds of years ago when the matai was King—and could do no wrong. This, the the Samoan way of life will not tolerate. This statute is a step backward in Samoan history.

8. The Samoan way of life exists for all—matais and non-matais. To each the courthouse door must be open.

9. The fears expressed by the Defendants' witness of damage to the system are sincere but unfounded. The honest, trustworthy matai who is dedicated to his family need not fear judicial review of his actions. Actually, removing this section will strengthen and benefit the system. Court review will benefit the system by having the rare matai who oversteps his authority brought into conformity with the vast majority of matais who do render fair, just, and wise decisions in family matters relating to communal land.

To us it is manifest that this statute is in violation of due process provisions of both the U.S. and American Samoa Constitutions. It also is in contravention of the the equal protection of the laws provisions of the U.S. Constitution by any of the three tests we apply. It bears no relationship to a legitimate state interest. It is not necesarry for the furtherence of a compelling state interest. It is not reasonably and directly related to a legitimate goal.

Much was said by the Defendants of the court substituting its opinion for that of the Sa'o. No way.

A family member feeling aggreived can only ask for judicial review of the Sa'o's actions. The court will only act to enjoin arbitrary, capricious, or illegal actions or those in which there has been an abuse of discretion on the part of the matai.

The court will obviously enjoin threatened illegal actions.

The court will also enjoin arbitrary and capricious actions. However, these must be willful and unreasoning, without due consideration and in disregard of facts. If there is room for two reasonable opinions, the action is not arbitrary and capricious.

Additionally, the court will enjoin a matai who has been guilty of an abuse of discretion. However, an abuse of discretion will be decreed only when, after calm and careful reflection on the entire matter, it can fairly be said that no matai would reasonably so act under the same circumstances.

The court will not substitute its opinion or its judgement for that of the Sa'o.

Additionally, henceforth it will be necessary for a family member to plead and prove a good faith effort to discuss and resolve the matter with the Sa'o and the family prior to the filing of the lawsuit.

We conclude with two observations.

First, the importance of this lawsuit has been blown completely out of proportion. When all the tumult and shouting die down and the situation can be viewed dispassionately and objectively one fact stands out with unshakable clarity. This Territory got along without this law for 81 years and the Matai system remained robust and healthy in spite of a scattering of challenges in court of a Matai's decision by non-matais. Thus, in addition to its obvious unconstitutionality, this section is simply unnecessary.

Second, if the proponents of this law are still convinced that this statute is necessary to protect the Matai system, the first order of business on their part should be the calling of a constitutional convention for the purpose of asking the voters of American Samoa to amend its constitution by removing therefrom the due process of the law provision. That provision is clear--"No person shall be deprived of life, liberty, or property without due process of law." It does not distinguish between matais and non-matais. It protects all persons. In other words, this decision was mandated by the Constitution of American Samoa without recourse to the Constitution of the United States.

If the citizens of this Territory desire to establish two categories of "persons" they must do so in their charter.

However, at the present, under the Constitution of American Samoa "all persons" are entitled to due process of the law and that means both matais and non-matais.

The motion for Dismissal of the complaint under section 43.1309 ASCA will be denied on the ground that the section is unconstitutional for the reasons stated above.

This matter will be set for a hearing on the merits at the request of either party.



