CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Plaintiff,

v.

Hon. Donald P. HODEL, Secretary of the Interior, et al., Defendants.

Civ. A. No. 85–1894.

United States District Court, District of Columbia.

May 30, 1986.

moa—the Samoan way of thinking and doing. The land, known as "Malaeimi," is located in the territory of American Samoa. Most recently, plaintiff Corporation for the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints ("the Church") was deprived of its interest in Malaeimi by decision of the High Court of American Samoa. Plaintiff appealed that decision to defendant Secretary of the Interior, who by executive order is responsible for all civil, military and judicial authority in the territory. The Secretary declined to overrule the Samoan court, however, and the Church now appeals his decision here. Because the Court finds that plaintiff has failed to raise a valid constitutional or federal statutory claim, it will grant defendants' motions to dismiss.

## I. FACTS[1]

American Samoan law recognizes three kinds of property: "communal" land, which is held by a chief, or "matai," as custodian for his clan; "freehold" lands, which are those specifically included in court grants prior to 1900; and "individually-held" land, which an individual may hold for his own benefit if he cleared and developed virgin bush. *See* American Samoa ("Am. Samoa") Code § 37.0201(b); Response of American Samoan Government to Memorandum to Counsel, p. 2, question 2. Over ninety percent of land in American Samoa is held communally. *See* Notice of Filing by American Samoan Government, May 2, 1986. The importance of communal landholding to the Fa'a Samoa is evidenced by the fact that, since their earliest contacts with the West, Samoans have insisted on protecting the communal land system from encroachment.[2] The constitution of American Samoa expressly commits the government there to a policy of preventing the transfer of land to non-indigenous persons. Rev. Const. of Am. Samoa, Art. I, § 3. By

Wilford Kirton, Jr., Salt Lake City, Utah, pro hac vice, and Marcus Faust, Washington, D.C., for plaintiff and proposed intervenors.

Harold Iselin, U.S. Dept. of Justice, Washington, D.C., for defendant.

Marcus Sisk, Washington, D.C., and L. Su'esu'e Lutu, Atty. Gen. of American Samoa, for intervenor American Samoa Government.

## MEMORANDUM

GASCH, Senior District Judge.

This case involves the Mormon Church, title to land that has been in dispute since the turn of the century, and the Fa'a Sa-

---

1. A detailed history of the legal dispute over title to Malaeimi is contained in *Nouata v. Pasene*, Ap. No. 007–79 (H.C. A.D., July 11, 1980), Exh. C, Deft. Hodel's Motion to Dismiss.

2. As stated by the Attorney General of American Samoa, L. Su'esu'e Lutu, at oral argument on February 20, 1986:

Every Western power that has entered the Samoan islands, not just the United States, in their official documents and treaties, has recognized what anyone who has ever visited Samoa or knows anything about Samoa knows, that the culture is integrally involved in communal ownership of land, and to upset

law, communally held lands cannot be alienated to persons of less than fifty percent Samoan blood. Am. Samoa Code § 37.0204(b).[3] A matai has the right to "pule", or control, over land held communally for his clan.

The matai of the Puailoa family, Puailoa Vaiulu, held the land known as Malaeimi at his death in 1929. At that time, the Mormon Church had been leasing for some 23 years a 360–acre portion of Malaeimi for use as a mission.[4] In 1930, two individuals named Nouata and Pasene asked the High Court of American Samoa[5] to decide who should succeed Vaiulu as matai. While that case was pending, the Mormon missionaries asked Samoan authorities to determine to whom it should pay rent. Because that issue was intimately intertwined with the issue of the successor to matai, the High Court advanced the *Nouata* matter ahead of 25 other cases on the court's calendar. The Church was not a party to the case, however. Vaiulu's widow, Salataima, was not a party either, but was a chief witness concerning both the issues of matai and the rent payments. She testified that Vaiulu had obtained a right to the land by protecting it from takeover by a foreign corporation in a previous lawsuit, and had stated on his deathbed that he intended her to receive the rents.

An oral opinion, delivered for the court by Judge Wood, named Nouata matai, and awarded the rents to the widow:

> or destroy that feature of Samoan society would ultimately destroy the society.
> *See also* the Deed of Cession of Tutuila and Aunuu, April 17, 1900, and the Deed of Cession Manu'a Islands, July 26, 1904, in which the islands ceded authority to the United States, Exh. C, motion to dismiss of American Samoan Government ("ASG"). The latter states "that the rights of the Chiefs in each village and of all people concerning their property according to their customs shall be recognized." *Id.*, Art. I, § 3. *See also King v. Andrus*, 452 F.Supp. 11, 15 (D.D.C.1977); *Craddick v. Territorial Register of American Samoa*, Ap. No. 10–79 (H.C. A.D., April 23, 1980), Pltf.'s Doc. App. Item 10, pp. 42–44.

3. Section 37.0204(b) states in relevant part:
   (b) It is prohibited to alienate any lands except freehold lands to any person who has less than one-half native blood, and if a per-

As to the land Malaeimi it is also the unanimous decision of the court that that part of Malaeimi that is leased to the Mormon Missionaries is the property of the widow of Puailoa and that she should have during her lifetime the rents. While she is living it is suggested that she shall make a written statement signed by two witnesses, who she wants this money to go to after her death if the lease is still running....

As to the other lands of Puailoa the court decides they should be held by Puailoa [Nouata] as the matai of the Puailoa family for the benefit of the whole family.

*Nouata v. Pasene*, L.T. No. 18–1930 (H.C. L.T. 1931), p. 20, Deft. Hodel's Exh. B ("*Nouata I*"). The court reached this conclusion even though there were no pleadings on the rent issue and no testimony pertaining to it, other than that of the widow.

In 1953, after a change in Samoan law made it possible to alienate noncommunal lands to non-Samoans, the widow sold to the Church some 300 acres of the land that it had previously leased. The Church paid $30,000.00 and built, in addition to church facilities, a school and a welfare plantation. The school buildings were eventually transferred to the American Samoan Government for use as a community college.

> son has any nonnative blood whatever, it is prohibited to alienate any native lands to such person unless he was born in American Samoa, is a descendant of a Samoan family, lives with Samoans as a Samoan, lived in American Samoa for more than 5 years and has officially declared his intention of making American Samoa his home for life.

4. Although the land at issue here is only a portion of Malaeimi, the Court, for convenience, will use that term to refer to the disputed acreage.

5. The High Court of American Samoa consists of three divisions: the Land and Title Division (H.C. L.T.); the Trial Division (H.C. T.D.); and the Appellate Division (H.C. A.D.). *See* Am. Samoa Code § 3.0201 *et seq.*, Exh. E, motion to dismiss of deft. ASG.

The Puailoa family was unhappy with Judge Wood's decision, and almost immediately after it was handed down, wrote the governor of American Samoa, arguing that the court had improperly considered the widow's right to the property. The confusion over the status of the land was again evidenced when the Church asked Samoan authorities to approve the 1953 sale, at which time the president of the Church's Samoan Mission acknowledged a suit might be necessary to quiet title to the property. *See Governor's Report Regarding Purchase*, April 21, 1952, Pltf's. Opp. to ASG Motion to Dismiss, Exh. 5.

In 1978, matai Tavete M. Puailoa officially petitioned the High Court to set aside *Nouata I. Nouata v. Pasene*, L.T. No. 18–1930 (H.C. L.T., Feb. 20, 1979), Deft. Hodel's Exh. C ("*Nouata II*"). The petition was denied by the trial court on the theory that the family had slept on its rights for 47 years. *Id.* at 22. On appeal, the appellate division held the petition was timely, but denied it on the merits. Writing for the court and sitting by designation of the Secretary of the Interior, Judge Anthony Kennedy of the Ninth Circuit found the 1931 judgment valid. *Nouata v. Pasene*, Ap. No. 007–79 (H.C. A.D., July 11, 1980), p. 9, Deft. Hodel's Exh. C ("*Nouata II*"). He stated that Tavete, as successor in interest to a party to *Nouata I*, was bound by the 1931 holding, and that *Nouata I* had properly reached the issue of the rent payments because that subject was intimately related to the issue of the matai successorship. *Id.* at 14. Since it was understood by all parties to *Nouata I* that both issues would be resolved simultaneously, the 1931 decision was not void "to the extent that it bears upon the status of the land Malaeimi." *Id.* at 17. However, he added, "[The Court] intimate[s] no views as to the interpretation of the 1931 decision or its bearing on the ultimate question of title, only that it is valid as to these parties." *Id.* at 20.

Despite this adverse ruling, members of the Puailoa family entered onto the property and began farming it. To prevent this, the Church brought a trespass action in 1979. *Reid v. Tavete, etc.*, L.T. Nos. 007–79 and 041–79 (H.C. L.T. April 19, 1982), Deft. Hodel's Exh. D ("*Reid I*"). As a defense, the Puailoa family members asserted the 1953 deed conveying the land to the Church was void because the land was communal property and could not be alienated by the widow individually. The trial court found for defendants and declared plaintiff's deed void, for two reasons. First, the Court found Malaeimi could not be freehold land since it nowhere appears on the Record of Court Grants that was made in 1900. By statutory definition, only lands in this record could be freehold. *See* Am. Samoa Code § 37.0201(b). Second, the Court reviewed numerous records of judicial decisions and trials early in this century concerning the extent of the Puailoa holdings, and found several references to Malaeimi as communal land of the family. The court interpreted the 1931 *Nouata I* decision as granting the widow a life estate in the rents, but not freehold title to the land. As it was communal land, the court concluded, she could not convey it to the Church. In the alternative, the court rejected the Church's adverse possession claim, stating that the Church had not met the statutorily required thirty-year occupancy requirement.[6] The *Reid I* court did not consider itself bound by Judge Kennedy's opinion in *Nouata II*, because that opinion expressly stated that it did not bear on the ultimate question of title to Malaeimi.

The core holding of *Reid I* was affirmed on appeal,[7] with the appeals panel rejecting the Church's argument that res judicata barred the trial court from depriving it of

---

**6.** There is a dispute that *Reid I* erred in applying the current adverse possession statute, Am. Samoa Code § 37.0120.

**7.** The trial court in *Reid I*, while holding that "pule" over the Mormon holdings be returned to the Puailoa family, ordered the family to pass to

the American Samoa Government title to that portion of the property leased to the ASG and containing the school buildings for which the Church had already been paid. *Reid I, supra* at 13. The trial court also held that the Church be allowed to retain a small portion of the land containing Church buildings and a parsonage,

title. *Reid v. Puailoa,* Ap. No. 014–82, etc. (H.C. A.D. Mar. 30, 1983) (per curiam), Deft. Hodel's Exh. E (*"Reid II"*). The Church based its res judicata theory on the *Nouata* cases. However, the appeals court noted that the 1931 *Nouata I* opinion, delivered orally by Judge Wood, was ambiguous as to the issue of whether Malaeimi was communal property. It further held the *Reid* trial court's interpretation of the 1931 opinion was not clearly erroneous in finding, on the basis of evidence extrinsic to the *Nouata* cases, that the land was communal. The appeals court concluded *Nouata II* "merely determin[ed] the propriety of the trial court's denial of a motion for a new trial," and therefore could not constitute res judicata on the issue of title to Malaeimi. *Id.*

The *Reid* appeals court also rejected the Church's alternative argument based on adverse possession because the Church could not establish that it had been in possession of the property for the statutorily-required period. In a footnote, the court added that in any event, the adverse possession statute as applied to communal lands would be limited by the racial restrictions on alienation stated in Section 37.0204. *Id. See* note 3, *supra.*

The Church asked the High Court for a rehearing, which the court denied. *Reid II,* Order, Dec. 11, 1984, Deft. Hodel's Exh. F. The order can be summed up in the court's own words: "The trial court concluded, and we agreed, that Salataima had no title to pass." *Id.* In its motion for rehearing the Church apparently argued that the land, while perhaps not freehold, may have been "individually-owned" by the widow. The court found the property could not meet the Samoan common law definition of individually-owned land. Even if the property had been individually owned, the court not-

ed in the alternative, it could not have been conveyed to the Church because of the racial restriction on alienation. The court again rejected the Church's adverse possession claim, adding, in addition to the grounds stated in the main decision, that the Church had failed to establish exclusive possession during the statutory period. *Id.*

After being turned down the second time by the High Court, the Church appealed to Secretary of the Interior, who exercises all judicial powers in American Samoa. Executive Order No. 10264 (June 29, 1951), 3 C.F.R. 765 (1949–1953 Compilation). In a letter dated June 7, 1985, Secretary Donald Hodel declined to upset the *Reid* decisions, stating that to do so would undermine a policy fostering greater self-government and self-sufficiency in American Samoa. Given that the record did not present a clear case of abuse of judicial discretion, the Secretary would not intervene. Deft. Hodel's Exh. H.

Plaintiff asks this Court to review defendant Hodel's decision on a variety of theories. Plaintiff contends the Secretary's decision resulted in the taking of its property without compensation or due process, in violation of the fifth amendment. It further contends that the application of the racially restrictive land alienation statute against it violates equal protection and deprives it of its civil rights under 42 U.S.C. §§ 1981—1983. Plaintiff further challenges the structure of the judicial system in American Samoa, and finally, asks the Court to review the Secretary's decision under the Administrative Procedure Act.

At oral arguments on February 20, 1986, the Court granted a motion to intervene as defendant by the American Samoa Government ("ASG"). In addition to its general interest in the issues raised by this suit,[8] the ASG has an interest in Malaeimi by

pursuant to Am. Samoa Code § 37.0204(d). *Id.* at 14. The court further ordered the Puailoa family to reimburse the Church for the reasonable value of improvements made on the land. *Id.* On appeal, the High Court reversed the trial court on these items, because they involved parties not joined or matters not pleaded. The appeals court urged the interested parties to try to negotiate a settlement of these issues. *Reid II, supra.* The Puailoa family eventually con-

veyed the school property to the ASG. The Church has, since initiating this litigation, tendered a quit-claim deed to ASG for the school property, so that ownership of the community college will not be affected by the outcome of this case.

**8.** At oral argument, Attorney General Lutu stated, "This is without a question the most important outside judicial action involving American

virtue of the fact that following the *Reid* rulings, the Puailoa family conveyed to it the property on which the community college is situated.[9]

Defendants move to dismiss the entire complaint under Federal Rule of Civil Procedure 12(b) on the grounds that this Court lacks jurisdiction and that plaintiff fails to state a claim upon which relief may be granted.

## II. JURISDICTION

■ Defendants attack this Court's jurisdiction, which plaintiff bases on 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (mandamus).[10] The Court of Appeals for this circuit has clearly answered defendant Hodel's objections to jurisdiction:

Here, the sole defendant is the Secretary of the Interior, and the issue is whether he has administered the government of American Samoa in accordance with the requirements of the United States Constitution. Clearly, the Secretary is within the geographical jurisdiction of the United States District Court for the District of Columbia, and that court is competent to judge the Secretary's administration of the government of American Samoa by constitutional standards, and if necessary, to order the Secretary to take

appropriate measures to correct any constitutional deficiencies.

*King v. Morton,* 520 F.2d 1140, 1144 (D.C. Cir.1970). So long as plaintiff can make out a valid claim under the Constitution or a federal statute, jurisdiction exists under 28 U.S.C. § 1331. *Id.*

■ Plaintiff also relies on 28 U.S.C. § 1361, arguing that mandamus jurisdiction would be proper because the Secretary has a clearly established duty to administer American Samoa in accordance with the Constitution. Without accepting the correctness of plaintiff's characterization of the law,[11] the Court observes that under plaintiff's theory, mandamus jurisdiction would exist only if plaintiff could establish violation of some constitutional right or existence of some constitutional duty. Therefore, as with federal question jurisdiction, mandamus jurisdiction depends on whether plaintiff's complaint validly raises any constitutional claim.

## III. THE CONSTITUTIONAL CLAIMS

### A. *The Fifth Amendment Claims*

In Count One, the Church contends that the *Reid* decision was a radical departure from well-settled law, thereby depriving plaintiff of property in violation of the fifth amendment.[12] Plaintiff's fifth amendment

---

Samoa in the history of our relationship with the United States. In fact, the broad allegations raised by the plaintiff go to the very heart of that relationship."

**9.** A separate motion to intervene as plaintiffs, brought by six individual Samoans challenging the racially-restrictive land alienation statute, remains before the Court. For reasons stated in Part III(B), *infra,* the Court will deny their motion to intervene.

**10.** Plaintiff also relies on the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, as sources of jurisdiction. It is well settled that those acts merely afford plaintiff additional remedies, but are not independent grounds for federal jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950) (declaratory judgment); *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977) (Administrative Procedure Act).

**11.** *See* Laughlin, *The Burger Court and the United States Territories,* 36 Fla.L.Rev. 755, 760–778 (1984), and Note, *The Application of the American Constitution to American Samoa,* 9 J. of Internat'l. L. & Econ. 325 (1974), for discussions of just how unclear the law is concerning the issue of the applicability of the United States Constitution to territories.

**12.** The fifth amendment states in relevant part: No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.
U.S. Const. amend. V. The Court recognizes that normal constitutional principles cannot be rigidly applied in the case of unincorporated territories such as American Samoa, which have wholly dissimilar traditions and institutions from the continental United States, *Reid v. Covert,* 354 U.S. 1, 13, 77 S.Ct. 1222, 1228, 1 L.Ed.2d 1148 (1957), and that generally the Court must undertake a close examination of the present cultural milieu of American Samoa to determine whether a particular constitutional princi-

claims, although necessarily intertwined, rest on two separate rights guaranteed by the Constitution. The first is that the government shall not take property for public use without compensation. The second is that no one shall be deprived of property without due process of law.

### 1. The "Takings" Claim

■ The takings clause is a constitutional limitation on the sovereign's inherent power to usurp private property for its own use. *United States v. General Motors Corp.*, 323 U.S. 373, 377, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945); *United States v. Jones*, 109 U.S. 513, 518–19, 3 S.Ct. 346, 349–50, 27 L.Ed. 1015 (1883); *Kohl et al. v. United States*, 91 (1 Otto) U.S. 367, 372–73, 23 L.Ed. 449 (1875). It requires the government to exercise the power of eminent domain only for a public purpose, and only if just compensation is paid to the property owner. However, "[t]he question of what constitutes a taking for the purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

In dicta, the Supreme Court has recognized that a court judgment could effect an unconstitutional taking, if the court's decision worked an "unpredictable," "unforeseeable" or "sudden" change in the law that resulted in the transfer of private property to the state. *See Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 331, 94 S.Ct. 517, 528, 38 L.Ed.2d 526 (1973), *overruled on other grounds, Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *Hughes v. Washington*, 389 U.S. 290, 297–98, 88 S.Ct. 438, 442–443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring).[13] The Court has also stated that "gross" or "arbitrary" error by a state court may amount to an unconstitutional taking for the state without due process. *Roberts v. City of New York*, 295 U.S. 264, 277, 55 S.Ct. 689, 691, 79 L.Ed. 1429 (1935).

Thus, the Supreme Court has intimated, without ever squarely holding, that a court may effect an unconstitutional taking by force of judgment when it arbitrarily reverses precedent and awards property to the state. The Supreme Court has also recognized that a legislative body effects an unconstitutional taking when it transfers property, without any justifying public purpose, from one private party to another. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984); *Thompson v. Consolidated Gas Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937). It does not necessarily follow, however, that a court effects an unconstitutional taking when its judgment results in the transfer of private

---

ple applies to the territory. *See King v. Morton, supra*, 520 F.2d at 1146–47. However, the High Court of American Samoa has itself ruled that fifth amendment due process and equal protection standards do apply to that territory. *Craddick, supra*, at 12. *Cf. Torres v. Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); *Examining Board v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (both holding that the due process guarantee of the fifth amendment is applicable to territorial governments). Because the Court herein determines that the Church has failed to make out a due process or "taking" claim, it is not necessary to undertake the careful analysis called for in *King v. Morton*.

**13.** In *Hughes*, the Supreme Court reversed a decision by the Supreme Court of Washington state declaring that lands added by accretion to the Washington coast line belonged to the state, and not to a property owner along the shore.

The majority held that the state court erroneously applied state law, when federal common law governed the question. *Hughes, supra*, 389 U.S. at 292, 88 S.Ct. at 439. Justice Stewart concurred in the result, but would have ruled in the property owner's favor on the grounds that the state court ruling, which reversed a 20-year-old precedent, was an unconstitutional taking.

[T]o the extent that it constitutes a sudden change in state law, unpredictable in terms of the relevant precedents, no such deference [to the state court] would be appropriate. For a State cannot be permitted to defeat the constitutional prohibition against taking property without due process by the simple device of asserting retroactively that the property it has taken never existed at all. Whether the decision here worked an unpredictable change in state law thus inevitably presents a federal question for the determination of this court. *Id.* at 296–97 88 S.Ct. at 442 (citations omitted) (Stewart, J. concurring).

property to another private party, even if based on erroneous reversal of precedent.

Unlike the case at bar, *Bonelli* and *Hughes* involved judicial decisions resulting in property accruing to the state, and not to another private party. Similarly, the present case may be distinguished from *Hawaii Housing* and *Thompson,* as those cases dealt with the acts of legislative or quasi-legislative bodies, and not courts. These distinctions are significant, because unlike a legislature, a court allocates property between individual private parties almost every time it acts in a civil case. In many of those cases, a court must reconsider the applicable precedents. To paraphrase Justice Holmes, the court could not go on if to some extent values incident to property could not be diminished without paying for every change in legal precedent.[14]

■ As noted above, the takings clause is a constitutional limitation on the sovereign's power of eminent domain. A court resolving a title dispute between private parties is not exercising that power, but rather is analyzing precedent and other rules, and declaring the rights of the parties. *See* Chang, *Unraveling Robinson v. Ariyoshi: Can Courts "Take" Property?,* 2 Hawaii L.Rev. 57, 68 (1979), and sources cited therein. Only where the property is taken by a court for the public, *e.g., Chica-*

go, *Burlington and Quincy R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *Robinson v. Ariyoshi,* 441 F.Supp. 559 (D.Haw.1977), *aff'd,* 753 F.2d 1468 (9th Cir.1985), *appeal filed see* —— U.S. ——, 106 S.Ct. 565, 88 L.Ed.2d 550, or by the legislature for another private party, with or without a justifying public purpose, *e.g., Hawaii Housing, supra,* 467 U.S. at 241, 104 S.Ct. at 2329, is the takings clause implicated. It is not implicated where a court is refereeing a title dispute between two private parties.

■ If the Court accepted plaintiff's syllogism based on dicta in *Hughes* and *Hawaii Housing,* every judicially-resolved title dispute would be substantively reviewable under the takings clause to determine if the state court had arbitrarily or unforeseeably interpreted or reversed past precedent. Plaintiff's position would undermine one of the essential functions of the judiciary. "Simply put, courts do not 'take' because that would destroy their ability to resolve disputes. Courts do not 'take', they declare. If they were said to 'take', they could not effectively declare." Chang, *supra,* at 90. The Court concludes the takings clause is inapplicable to *Reid,* where a court simply determined the rights of two private parties concerning title to property.[15]

14. Justice Holmes said, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).

15. Plaintiff also relies on a much-criticized Hawaii case for support of its proposition that an unexpected reversal of precedent affecting title to property may be an unconstitutional taking. In *Robinson, supra,* 441 F.Supp. 559, the federal district court took collateral review of a Hawaii Supreme Court decision allocating water rights. The state court, reversing a 50-year-old precedent concerning common law riparian rights, had declared that rights to runoff within the Hanapepe River watershed accrued to the state and not to the individual property owners who had developed plantations in reliance on the precedent. *Id.* at 562. The *Robinson* court, relying on Justice Stewart's concurrence in *Hughes, supra,* 389 U.S. at 297–98, 88 S.Ct. at

442–43, declared the Hawaii Supreme Court decision void as an unconstitutional taking, insofar as the surplus water was concerned. *Id.* at 585–86. "This retroactive taking of private property *by and for the State,* without payment therefor, was clearly the result of 'perverse reading of prior law' as inferentially condemned in *O'Neil v. Northern Colorado Irrigation Co.,* 242 U.S. 20, 37 S.Ct. 7, 61 L.Ed. 123 (1916)," the *Robinson* court stated. *Id.* at 585 (emphasis added).

The *Robinson* case may be distinguished from the one at bar because the Hawaii Supreme Court *sua sponte* usurped the property for the state, as in *Hughes.* The court acknowledged no federal question was raised by that portion of the case concerning conflicting claims of private parties. *Id.* at 586–87. *See also Romie v. Casanova,* 91 (1 Otto) U.S. 379, 381, 23 L.Ed. 374 (1876) (private title dispute does not raise federal question). For criticism of *Robinson,* see Chang, *supra.*

The more difficult question remains, however, of whether the *Reid* rulings deprived plaintiff of property without due process by unexpectedly reversing precedent on which plaintiff had relied.

### 2. *The Due Process Claim*

Plaintiff's Count One also contends the *Reid* decisions deprived it of property without due process by failing to respect res judicata as established in the *Nouata I and II* cases. The Court reads plaintiff's complaint and pleadings concerning "res judicata" as encompassing the broad meaning of that term to include collateral estoppel or issue preclusion.[16]

■ Because res judicata "is a rule of fundamental and substantial justice," *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981), *citing Hart Steel v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917), plaintiff would have this Court hold that the High Court of American Samoa denied it due process by failing to apply the doctrine in the *Reid* case. *Cf. Robinson, supra,* 441 F.Supp. at 585; *Sotomura v. County of Hawaii,* 460 F.Supp. 473, 482 (D.Haw. 1978). Plaintiff fails to cite, however, and this Court has not found, any Supreme Court decision that expressly holds that failure to apply res judicata is violative of the due process clauses of the Constitution.

■ Moreover, where, as here, a territorial court has specifically considered whether res judicata would be applicable to a question of territorial law, and rejected its applicability, *Reid II, supra,* this Court must respect that determination absent a showing that the territorial court acted unconstitutionally. *See Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.,* 309 U.S. 4, 8, 60 S.Ct. 215, 217, 84 L.Ed. 447 (issue of whether judgment of a state court is res judicata is a question of state law);

*Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982). *Cf. Angel v. Bullington,* 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) (federal court sitting in diversity jurisdiction must give res judicata effect to state court ruling on same issue). Under 28 U.S.C. § 1738 (1982), this Court is required to give full faith and credit to the judicial proceedings of state and territorial courts:

> Such … proceedings … shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such state, Territory or Possession from which they are taken.

Interpreting this statute as it applies to state court determinations of res judicata, the Supreme Court has said,

> It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effects of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken. … Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the Courts of the State from which the judgments emerged would do so. …

*Kremer, supra,* 456 U.S. at 481–82, 102 S.Ct. at 1897–98. This Court could avoid the preclusive effect of the local court's determination only if the local court had failed to satisfy the minimum procedural requirements of due process. *Id.* at 481, 482–83, 102 S.Ct. at 1897, 1898. Given that the statute interpreted in *Kremer* is equal-

---

16. "Res judicata," strictly speaking, bars a second suit, involving the same parties and the same cause of action, on all matters that were or could have been litigated in the first suit. Collateral estoppel, on the other hand, precludes relitigation only of issues that were actually litigated in the initial suit, whether or not the

second suit is based on the same cause of action. *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982) (citations omitted); *Precision Air Parts, Inc. v. AVCO Corp.,* 736 F.2d

ly applicable to territorial courts as state courts, its holding would govern here.[17]

■ Even if this Court agreed with plaintiff that the *Reid* decision was incorrect in its refusal to apply res judicata based on the *Nouata* cases, legal error alone does not violate due process. "It is firmly established that a merely erroneous decision given by a state court in the regular course of judicial proceedings does not deprive the unsuccessful party of property without due process of law." *American Railway Express Co. v. Kentucky,* 273 U.S. 269, 273, 47 S.Ct. 353, 354, 71 L.Ed. 639 (1927) (citations omitted). "[T]he mere fact that a state court has rendered an erroneous decision on a question of state law, or has overruled principles or doctrines established by previous decisions on which a party relied, does not give rise to a [due process claim]...." *Brinkerhoff-Faris Co. v. Hill,* 281 U.S. 673, 680, 50 S.Ct. 451, 454, 74 L.Ed. 1107 (1930). "The Fourteenth Amendment is not a guarantee that a trial shall be devoid of error." *Roberts, supra,* 295 U.S. at 277, 55 S.Ct. at 691. "[T]he mere fact that the state court reversed a former decision to the prejudice of one party does not take away his property without due process of law." *Tidal Oil*

*Co. v. Flanagan,* 263 U.S. 444, 450, 44 S.Ct. 197, 198, 68 L.Ed. 382 (1924).[18]

■ While an erroneous reading of the law or unexpected reversal of precedent does not by itself violate the Constitution, a local court may not reach that result without according a party a full and fair hearing. A local court has the power to construe a statute or overrule a case, with the result that a party is deprived of property. But it may not do so "without [the party's] ever having had an opportunity to defend against the exaction." *Brinkerhoff-Faris, supra,* 281 U.S. at 679, 681–82, 50 S.Ct. at 453, 454. Thus, when reviewing a local court ruling that, through an upheaval in precedent, deprives a party of property, the Supreme Court has distinguished between substantive holdings and procedure.[19] *Id.; see also American Railway Express, supra,* 273 U.S. at 727–73, 47 S.Ct. at 354–55; *cf. Kremer, supra,* 456 U.S. at 481–82, 102 S.Ct. at 1897–98. There is no allegation here that plaintiff was denied procedural due process in the course of these particular proceedings. *See infra,* Part III(C).

■ Furthermore, even were this Court to review the substance of the territorial

---

1499, 1501 (11th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 966, 83 L.Ed.2d 970 (1985).

**17.** There are few, if any, cases on these precise issues involving territorial courts. Therefore, the Court necessarily must consider cases involving state courts. As plaintiff relies on many of these same cases, the Court can discern no reason why the same principles should not apply to territorial courts.

**18.** The facts of *Tidal Oil* are relevant here. There, a state court had originally ruled in favor of grantees who took property from a minor, when the minor's guardian challenged the conveyance. When the minor reached his majority, he conveyed his property to a third party. When the grantees in the first case challenged title of the third party, the state court ruled in favor of the third party despite the earlier holding in favor of the original grantees. The Supreme Court held that the state court's "reversal" of the first decision, though it deprived the grantees of title, did not violate due process. *Tidal Oil, supra,* 263 U.S. at 450, 44 S.Ct. at 198. Thus *Tidal Oil* teaches that even where a local court refuses to enforce a prior ruling relating to an individual party's specific interest in prop-

erty, this does not, without more, violate due process.

**19.** *But see O'Neil, supra,* 242 U.S. at 26–27, in which Justice Holmes, in dictum, inferred a "perverse reading of the law" that resulted in deprivation of property might deny a party due process. *See also Demorest v. City Bank Co.,* 321 U.S. 36, 42–43, 64 S.Ct. 384, 388, 88 L.Ed. 526 (1944), in which the Supreme Court implied that a state court decision that retroactively deprived a party of a property right vested by state law would be unconstitutional. "It is the province of this Court to inquire whether the decision of a state court rests on a fair or substantial basis. If insubstantial, constitutional obligations may not thus be evaded." However, Justices Black and Douglas wrote separately to take issue with that language: "That is a question of New York law .... It is none of our business—whether we deem that interpretation to be reasonable or unreasonable, sound or erroneous." They would have dismissed the case for failure to raise a federal question. *Id.* at 49, 64 S.Ct., at 391.

courts' holding in *Reid*, it would not conclude the *Reid II* decision was clearly erroneous in its refusal to apply res judicata. In assessing plaintiff's res judicata argument, the *Reid* courts undertook proper analytical steps, beginning with a determination of the meaning of the *Nouata* cases.[20] *Reid II, supra.* The trial court found the 1931 ruling ambiguous, and stated that *Nouata I* could not have held that the disputed land was freehold since the property did not appear on the land grant rolls. *Reid I, supra.* It next determined, based on cases older than *Nouata I*, that Malaeimi had been communal land. Based on a number of Samoan precedents recognizing a matai's right to grant life interests in communal land, and the right of a matai to permit continued use of communal land by his family following his death, the *Reid* trial court concluded the 1931 decision did not stand for the proposition that the portion of Malaeimi leased by the Mormon missionaries was the freehold or individual property of Salataima, but merely recognized that she had a life estate in the rents therefrom.[21] The *Reid* trial court determined the 1931 decision did not find that the widow held the land individually or in freehold. Therefore, *Reid I* concluded *Nouata I* could not constitute res judicata on that issue. *Id.* As to *Nouata II*, the *Reid* appeals court found that opinion did not stand for the proposition that Malaeimi was noncommunal property, but rather, merely stated that the Puailoa family believed, on the basis of the 1931 suit, that it was not communal.[22] Because *Nouata II* simply adjudged the family's right to reopen the 1931 case, it could not preclude a later challenge to title to Malaeimi. *Reid II, supra.*

The *Reid* opinions constitute a reasonable effort to understand an oral opinion delivered by a judge attempting to reconcile the Fa'a Samoa with western concepts of property in an era when justice was an informal affair in American Samoa. As such, it is not clearly erroneous or even an abuse of discretion. It certainly does not constitute the type of arbitrary, gross or "perverse" reading of the law which this Court would have to find in order to conclude that *Reid* deprived plaintiff of property without due process. *See O'Neil, supra*, 242 U.S. at 26–27; *Demorest, supra*, 321 U.S. at 42–43, 64 S.Ct. at 388; *Roberts, supra*, 295 U.S. at 277, 55 S.Ct. at 691.

In sum, plaintiff's fifth amendment claims must fail. Judicial resolutions of title disputes between two private parties do not implicate the takings clause of that amendment. This Court must respect a territorial court's determination that res judicata is inapplicable to issues of local law, unless that decision is constitutionally infirm. However, a mere error of law, even if one existed, would not deprive a party of property without due process. Therefore, Count One of plaintiff's complaint is dismissed for failure to state a claim.

### B. *The Equal Protection Claims*

In Counts Two and Three, plaintiff alleges the High Court's reliance on Section 37.0204(b) of the American Samoa Code, *supra*, n. 3, barring the alienation of communal or individual land to persons of less than fifty percent Samoan blood, denied plaintiff equal protection of the law in vio-

---

**20.** As the Supreme Court stated in *Montana v. United States*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979), the first step in determining whether to apply a rule of preclusion is to inquire "whether the issues presented by this litigation are in substance the same as those resolved" in the previous litigation.

**21.** The *Reid* trial court viewed Judge Wood's suggestion to the widow that she direct to whom the rents should go upon her death as a recognition that, in light of the fact that she had no children, the rents would go back to some other member of the Puailoa family. *Reid I, supra.*

**22.** Judge Kennedy's precise words were: "As the appellants themselves interpret the decision, the court held that it was not then communal land and had not been for some time." *Nouata II, supra*, at 19. Whatever the holding of the 1931 case, Judge Kennedy held the current Puailoa matai was barred from challenging it as a successor in interest to the parties to the original suit. But the judge concluded, "We intimate no views as to the interpretation of the 1931 decision or its bearing on the ultimate question of title, only that it is valid as to these parties." *Id.* at 20.

lation of the fifth and fourteenth amendments of the United States Constitution. Plaintiff further alleges the High Court's reliance on this statute violated its civil rights as guaranteed in 42 U.S.C. §§ 1981–1983.

In the *Reid* cases, the High Court relied on the racially restrictive land statute only in its alternative holding in response to plaintiff's alternative theory of adverse possession. At the trial level, although the racial restriction was debated, the court's holding clearly rests on the grounds that the widow simply did not have title to Malaeimi to pass to the Church: "We further hold that the 1953 deed to the Church was void *ab initio* because it was an illegal conveyance, Malaeimi not being freehold land. We further hold that Malaeimi is and always has been the communal property of the Puailoa family." *Reid I, supra.* The Court also rejected the Church's adverse possession claim on the grounds that the Church had not been in possession of the land for the required statutory period. *Id.* It said nothing about the applicability of Section 37.0204(b) in the context of adverse possession.

The *Reid* appeals court also squarely based its opinion on the conclusion "that the land in dispute was the communal land of the Puailoa family at the time the widow attempted to deed it to the Mormon Church...." *Reid II, supra.* It also rejected plaintiff's adverse possession claim on the ground that plaintiff could not rely on the widow's occupancy to "tack" on years to satisfy the statutory period. *Id.* In a footnote, the court added that in any case, the adverse possession statute was limited in its effect by the restraint on alienation of land to non-natives found in Section 37.0204(b). *Id.* at n. 1.

The Church petitioned for a rehearing in *Reid,* raising for the first time a constitutional challenge to Section 37.0204(b). *See*

*Reid II,* Order of Dec. 11, 1984, at n. 1. The court denied the petition, stating again, "The trial court concluded, and we agreed, that Salataima had no title to pass." *Id.* Even if Malaeimi were individually-owned and not communally owned, the court added, title could not be conveyed to a foreign corporation because of Section 37.0204(b). *Id.* As to the adverse possession theory, the court reiterated its finding that the race restriction on land alienation limited the adverse possession statute, but added that plaintiff had also failed to demonstrate that it was in exclusive possession of the property during the statutory period. *Id.*

■ A review of these cases makes it clear that the Church was deprived of title to Malaeimi based on an interpretation of local law that the property was communal and therefore the widow had no title to pass. Therefore, as to the equal protection claim, plaintiff's complaint does not involve any substantial federal issue which would control the outcome of the underlying land dispute. Even if this Court were to strike down Section 37.0204 as unconstitutional, it would not change the ruling of the territorial court.[23] It is well-settled law that a complaint fails to raise a federal question if it contains no dispositive federal issue. *Cf. Wainwright v. Sykes,* 433 U.S. 72, 81–82, 97 S.Ct. 2497, 2503–04, 53 L.Ed.2d 594 (1977); *Black v. Cutter Laboratories,* 351 U.S. 292, 298, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956); *Herb v. Pitcairn,* 324 U.S. 117, 125–26, 65 S.Ct. 459, 462–63, 89 L.Ed. 789 (1945).

> To bring a case within the [federal question jurisdiction] statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. The right or immunity must be such that it will be supported if the Constitution or laws of

---

23. The Court notes that the High Court of American Samoa has considered an equal protection challenge to the racially restrictive land law, and found it passed constitutional muster because "American Samoa has demonstrated a compelling state interest in preserving the lands of American Samoa for Samoans and in pre- serving the Fa'a Samoa.... We find the prohibition against the alienation of land to non-Samoans to be necessary to the safeguarding of those interests." *Craddick v. Territorial Registrar,* Ap. No. 10–79 (H.C. A.D. April 23, 1980), Pltf.'s Doc.App. Item 10, p. 44.

the United States are given one construction or effect, and defeated if they receive another.

*Gully v. First National Bank in Meridian,* 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936) (citations omitted). Therefore, plaintiff fails to raise a valid constitutional claim in Counts Two and Three. Because the *Reid* courts did not base their holdings on the race restrictions against alienation, plaintiff's claim under the civil rights statutes must fail as well.[24]

■ In light of the foregoing, the Court will deny a motion to intervene as plaintiffs filed by six individual residents of American Samoa who allege Section 37.0204(b) unconstitutionally restricts their right to freely alienate land. Because the Church's Counts Two and Three will be dismissed, the intervenors do not raise a common issue of law or fact with plaintiff. *See* Fed. R.Civ.P. 24.

### C. *The Claim Challenging the American Samoan Courts*

In Count Four, plaintiff asserts it was denied due process because it had to try its case in the courts of American Samoa, which it alleges are neither independent nor competent. Plaintiff further asserts it was unconstitutionally denied access to an Article III court, and, because litigants in all other United States territories may appeal directly to an Article III court,[25] it was also denied equal protection.

The Secretary of the Interior's authority over American Samoa, and hence its judiciary, is in theory, plenary. 48 U.S.C. § 1661(c); Exec.Order No. 10264, *supra.* The Secretary approves the budget for the territory, and the budget for the courts. *See* Secretary's Order No. 2657 § 4 (Aug. 29, 1951, as amended, 1972). Laws relating to the organization of the courts must, like all statutes passed by the Samoan legislature, be submitted to the Secretary for approval. *Id.* § 2(6), § 4. The Secretary appoints the justices to the High Court, Rev.Const. of Am.Samoa, Art. III, §§ 1–3, and may remove them "for cause." Am. Samoa Code § 3.1001.[26]

However, except for his appointment power, the Secretary has generally removed himself from overseeing the routine

---

**24.** In an effort to have this Court reach the constitutional issue, plaintiff would have the Court consider and reject the High Court's factual findings concerning the nonexclusivity of the Church's possession of Malaeimi. It would also have this Court review that court's decision to apply the adverse possession statute currently in effect in American Samoa rather than one in effect earlier. This Court has no jurisdiction to review substantive rulings on local law by a territorial court. *See* Part III(A)(2), *infra.* The Court is also mindful of Justice Brandeis' warning that a court should not reach out to rule on the constitutionality of a statute. *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1938) (Brandeis, J., concurring).

**25.** *See* 28 U.S.C. § 41 (placing Puerto Rico in the First Circuit, the Virgin Islands in the Third, the Canal Zone in the Fifth, and Guam in the Ninth), § 91 (Midway, Wake, Johnston, Sand, Kingman Reef, Palmyra, Baker, Howland, Jarvis, Canton and Enderbury Islands within jurisdiction of district court of Hawaii and therefore appeal is had in the Ninth Circuit), § 1291 (courts of appeals shall have jurisdiction over appeals from all U.S. district courts and courts of the Canal Zone, Guam and Virgin Islands), § 1295 (Federal Circuit jurisdiction extends to appropriate appeals from those territories and

Northern Marianas). In addition, 48 U.S.C. §§ 1424, 1611 and 1694 create courts for Guam, the Virgin Islands and the Northern Marianas, respectively, which shall have jurisdiction equivalent to that of a federal district court. 48 U.S.C. §§ 1424(b), 1612(b), 1694a (1984). Nonetheless, these courts are territorial courts and not Article III courts. *Chase Manhattan Bank v. South Acres Development Co.,* 434 U.S. 236, 237, 98 S.Ct. 544, 545, 54 L.Ed.2d 501 (1978) (per curiam); *Guam v. Olsen,* 431 U.S. 195, 196–97 n. 1, 97 S.Ct. 1774, 1776 n. 1, 52 L.Ed.2d 250 (1977); *Reynolds v. United States,* 98 (8 Otto) U.S. 145, 154, 25 L.Ed. 244 (1879). By contrast, only the Commonwealth of Puerto Rico has its own Article III district court. 28 U.S.C. § 119.

**26.** Section 3.1001 states:

Chief and Associate Justices—Appointment.
  (a) There shall be a Chief Justice of American Samoa and an Associate Justice of American Samoa. Each shall be learned in the law and appointed by the Secretary of the Interior.
  (b) Subject to any applicable limitations contained in the statutes of the United States, each shall hold office during his good behavior, but may be removed by the Secretary of the Interior for cause.

affairs of the High Court. For example, once money is appropriated by the Department of the Interior for the courts, it is beyond the Department's control. *See* File B–1996690, Office of the Comptroller General, *Matter of Expenditures Incurred by the Government of American Samoa for the American Samoan Judiciary,* Mar. 14, 1980.[27] Similarly, the American Samoa Constitution and various statutes arrange for the courts to function without interference by the Secretary. The American Samoa Constitution, which may be modified only by act of Congress, 48 U.S.C. § 1662a (1983 Supp.), vests judicial power in the High Court and assures that the court shall be independent of the executive and legislative branches of the ASG. By statute, the Chief Justice is responsible for administering the courts, and he appoints and fixes salaries for nonjudicial personnel. Am.Samoa Code §§ 3.0102, 3.0205. The High Court also includes associate judges, who are appointed for four-year terms by the Governor of American Samoa upon recommendation of the Chief Justice and confirmation by the Samoan Senate. *Id.* § 3.1004. They, too, may be removed for cause, but by the Chief Justice. *Id.* § 3.1004(d). Associate judges are typically local matai, knowledgeable in the Fa'a Samoa but not necessarily educated in United States law. Comment, *Some Observations on the Judiciary in American Samoa,* 18 UCLA L.Rev. 581, 588 (1971). The Secretary of the Interior also frequently appoints as associate justices members of Article III federal courts in the United States to serve on the appellate division court from time to time.[28] *See, e.g., Reid, supra.*

The Secretary and the plaintiff contend that the Secretary of the Interior may review and reverse the decisions of the High Court.[29] Section 43.0804 of the American Samoa Code implies the Secretary has this right.[30] However, all parties agree that the Secretary has never of his own accord overruled a decision by the Samoan judiciary.[31]

27. The Comptroller General expressed the view that appropriations to the American Samoa judiciary were like grants to a "non-Federal entity," and "once awarded, the grant funds belong to the grantee subject only to the statutory, regulatory or restrictions in the grant instrument itself...." File B–1996690, *supra,* p. 5.

28. Any appeal to the High Court must be heard by a panel consisting of three justices and two associate judges (although a quorum of one justice and two judges may suffice). *Id.* § 3.0220. In land cases such as the one at bar, a majority of the five judges shall prevail, even if the majority consists of two judges and one justice. In all other cases, the majority must carry at least two justices. *Id.* at § 3.0221. The distinction is made presumably because associate judges, although not necessarily lawyers, are familiar with local land law and customs. *See Comment, supra,* at 588–89. The Chief Justice also sits on trials within the land and titles division, where all controversies relating to land are heard by one justice and two judges. However, if the justice differs from the two judges, his opinion prevails. *Id.* §§ 3.0240–41.

In the *Reid* case, at the trial level, Chief Justice Richard I. Miyamoto wrote the decision for a unanimous court. On appeal, a *per curiam* opinion was issued by a panel consisting of Associate Justice Thomas W. Murphy, two visiting United States district court judges, and two associate judges.

29. The ASG disputes the Secretary's authority to review High Court rulings on the theory that he has completely delegated away his adjudicatory functions. *King v. Morton,* however, necessarily stands for the proposition that the Secretary has the authority to review decisions of the High Court to assure they comply with any standards of the United States Constitution found to apply to American Samoa. 520 F.2d at 1144; *King v. Andrus,* 452 F.Supp. 11 (D.D.C.1977).

30. Section 43.0804 states:
Unless and until the Legislature of American Samoa provides for an appeal to a court created by an act of the Legislature, the decisions of the appellate division of the High Court shall be final. When and if the Legislature of American Samoa provides for an appeal from any decisions of the courts of American Samoa to a court created by an act of the Legislature, any right of appeal granted from such decisions to the appellate division of the High Court *and right or review by the Secretary of the Interior shall cease.* (Emphasis added). No appeals court has been created.

31. In the *King* case, the Secretary declined to overrule a High Court decision that plaintiff King was not entitled to a jury trial. Following a determination by the United States District Court for the District of Columbia that King was entitled to a jury, the Secretary was ordered not to enforce King's conviction. *King v. Andrus, supra,* 452 F.Supp. at 17.

■ Plaintiff contends that because the justices of the High Court are removable at the discretion of the Secretary alone, they lack sufficient independence to accord due process. This Court does not accept plaintiff's conclusion that the "for cause" requirement of Section 3.1001 is no limit on the Secretary's discretion to remove the justices. However, even if the Secretary could remove them at his sole discretion, this alone would not violate due process. *See Kalaris v. Donovan*, 697 F.2d 376, 397–98 (D.C.Cir.), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). *Kalaris* considered the constitutionality of having private rights adjudicated in the first instance by members of the Labor Department's Benefits Review Board, who sit at the discretion of the Secretary of Labor. This posed no constitutional problem, the court of appeals concluded, where the Board's decisions could be appealed to an independent court. *Id.* at 399–400. The court noted this kind of structure was mirrored throughout the federal bureaucracy and in territorial courts.[32] *Id.*, 400–01 & n. 103. To paraphrase *Kalaris*, the Church here has failed to indicate "why the additional degree of independence and protection [it] seek[s] is essential for dispassionate decisionmaking" in American Samoa but not in other settings where Congress has delegated judicial or quasi-judicial authority. *Id.* at 400–01.

Plaintiff next contends that it has a right to have its claim adjudicated by an Article III court, or a right to appeal directly to an Article III court. The federal district court in Hawaii faced a similar claim in the case of *Meaamaile v. American Samoa*, 550 F.Supp. 1227 (D.Haw.1982). Meaamaile

brought an action sounding in admiralty and tort in connection with injuries he suffered in a shipping accident and as a result of treatment in an American Samoa hospital. He sued in federal court in Hawaii, asserting a right to trial in "an Article III court staffed by judges independent of executive control". *Id.* at 1235. Judge King rejected his claim:

> The basic fallacy of plaintiff's argument is that its fundamental premise is unfounded—plaintiff is simply not entitled to a trial in an Article III court. Rather, he is entitled to a trial in the High Court of American Samoa, which is a territorial court duly constituted under *Article IV* of the United States Constitution.

*Id.* (emphasis in original). The court concluded, "Plaintiff cannot assert any denial of due process on the ground that the High Court cannot adjudicate his claims." *Id.* at 1236.

■ It has been well-settled since the early days of the Republic that territorial courts can render valid judgments in matters within their jurisdiction, even though they lack judges with the Article III attributes of life tenure and irreducible salaries. *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828). The Supreme Court recently reaffirmed the principle that territories are unique geographical areas where Congress has the authority, pursuant to Article IV of the Constitution,[33] to create courts that do not conform with the requirements of Article III.[34] *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64–65, 102 S.Ct. 2858, 2867–68, 73 L.Ed.2d 598 (1982) (opinion of Brennan, J.).

**32.** *See, e.g.*, Department of Justice, Board of Immigration Appeals, 8 U.S.C. § 1103 (1976), 8 C.F.R. § 3.1 (1982), whose members are appointed by and sit at the discretion of the Attorney General. *See Kalaris, supra*, 697 F.2d at 400 nn. 98–100 for other examples.

**33.** Article IV, § 3, cl. 2 states:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in the Constitution shall be so construed as to

> Prejudice any Claims of the United States, or of any particular State.

**34.** While the rationale behind this proposition is questionable in an era when most territories are not on their way to statehood, *compare, Glidden Co. v. Zdanok*, 370 U.S. 530, 544–46, 82 S.Ct. 1459, 1469–70, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.); *Northern Pipeline, supra*, 458 U.S. at 106–07, 102 S.Ct. at 2889–90 (White, J., dissenting), it is not within the province of a district court to question the long line of cases that begin with *Canter* and end with *Northern Pipeline* recognizing the validity of territorial courts.

It is equally well-settled that the jurisdiction of territorial and other non-Article III courts may extend to federal questions. As the Supreme Court has stated,

It is apparent that neither this Court nor Congress has read the Constitution as requiring every federal question arising under the federal law ... to be tried in an Art. III court before a judge enjoying lifetime tenure and protection against salary reduction. Rather, both Congress and this Court have recognized that state courts are appropriate forums in which federal questions and federal crimes may at times be tried; and that the requirements of Art. III, which are applicable where laws of national applicability and affairs of national concern are at stake, must in the proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment.

*Palmore v. United States,* 411 U.S. 389, 407–08, 93 S.Ct. 1670, 1681, 36 L.Ed.2d 342 (1973) (discussing the courts of the District of Columbia). *See also Balzac v. Porto Rico,* 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922); *Reynolds, supra,* 98 (8 Otto) U.S. at 154; *Clinton v. Englebrecht,* 80 U.S. (13 Wall.) 434, 447, 20 L.Ed. 659 (1872); *Benner v. Porter,* 50 U.S. (9 How.) 235, 243, 13 L.Ed. 119 (1850). Thus, the American Samoa courts may hear any federal claims raised by plaintiff.

However, plaintiff's case as originally framed in *Reid* could not have been brought in an Article III court, as it raised only issues of local law and was between nondiverse parties.[35] When a constitutional issue did arise in the course of litigation, plaintiff raised it before the High Court in a motion to reconsider, again when it

sought review by the Secretary, and eventually before this independent, Article III court. Plaintiff in effect will have more opportunities for review in Article III courts than a litigant in a state court, since it may appeal to a federal court of appeals and the United States Supreme Court, whereas the state court litigant may appeal only from the state's highest court to the Supreme Court. Therefore, its claim that it has been denied access to an Article III court is wholly unfounded.[36]

Finally, plaintiff contends it was denied equal protection because litigants in all other territories may obtain trial before an "independent" judiciary, and may appeal directly to Article III courts. The Court notes that congressional treatment of all other territorial courts is by no means uniform, as plaintiff would have us believe. As explained *supra,* n. 25, Puerto Rico is the only territory with its own Article III court. *See* 28 U.S.C. § 119. The other territories have courts created by Congress pursuant to its plenary powers under Article IV. In some instances, Congress has named those courts "district courts" and granted them jurisdiction that mirrors the jurisdiction of federal district courts. *See* 48 U.S.C. §§ 1424b (Guam); 1612 (b) (The Virgin Islands); 1694b (Northern Marianas). Judges on these courts are appointed by the President with the approval of the United States Senate and serve ten years unless removed by the President for cause. 48 U.S.C. §§ 1424b, 1614, 1694b. Plaintiff does not explain why judges who are removable by the President for cause should be considered any more or less independent than judges who are removable by the Secretary of the Interior for cause, particularly when the Secretary's authority over the

---

**35.** Plaintiff Reid was a representative of the local Mormon Church on American Samoa.

**36.** Plaintiff's claim that it is somehow prejudiced by being unable to obtain "direct" review without suing the Secretary of the Interior, as necessitated by *King v. Morton,* 520 F.2d 1140, is a distinction without a difference. If any party is prejudiced by lack of direct review, it would be the Puailoa family, the defendants in *Reid,*

who are not parties to this case. They could of course intervene if they desired.

Furthermore, it is by no means clear that it would be unconstitutional to deny plaintiff access to an Article III court altogether, as long as some tribunal existed to hear its federal claims. *See Lockerty v. Phillips,* 319 U.S. 182, 187–88, 63 S.Ct. 1019, 1022–23, 87 L.Ed. 1339 (1943). *But see Guam v. Olsen, supra,* 431 U.S. at 204, 97 S.Ct. at 1780.

Samoan judiciary was delegated from the President.

■ While it is also true that in all other territories litigants may appeal directly to an Article III appeals court, *see supra,* n. 25, litigants in American Samoa may obtain review in this Court via the mechanism of suing the Secretary of the Interior. *King v. Morton, supra,* 520 F.2d at 1144. As reasoned above, this unequal treatment does not implicate a fundamental right. The Supreme Court has said Congress may justify distinctive treatment for territories if it has a rational basis for doing so. *Cf. Harris v. Rosario,* 446 U.S. 651, 652, 100 S.Ct. 1929, 1930, 64 L.Ed.2d 587 (1980). Failure to provide for direct review by an Article III court may be explained by American Samoa's relatively small size, its geographical distance from any court of appeals, its desire for autonomy in local affairs, or most likely, by the fact that it is the only territory without an organic act. *Cf. Guam v. Olsen, supra,* 431 U.S. at 207, 97 S.Ct. at 1781 (Marshall, J., dissenting). Any differences between the other court systems and that in American Samoa do not violate the constitutional guarantee of equal protection.

In sum, the structure of the American Samoa court system does not in itself deprive plaintiff of due process, and plaintiff has made no factual allegations that it operated in this instance, by virtue of bias, incompetence or undue influence, to deprive it of due process. Congress has not created a wholly different court system for American Samoa than for all the other territories, and any differences may be accounted for rationally. Therefore, the Court concludes that as to Count Four, plaintiff has failed to state a claim upon which relief may be granted.[37]

## IV. THE APA CLAIMS

■ Plaintiff's Count Five asks the Court to review the Secretary's refusal to overturn *Reid* under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. The APA by its own terms is inapplicable to "the governments of the territories or possessions of the United States." 5 U.S.C. § 701(b)(1)(C). As the Secretary of the Interior is being sued in his capacity as overseer of the government of American Samoa, his decision would not be reviewable under the APA. *See People of Saipan v. Dept. of Interior,* 502 F.2d 90, 95 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

Even if this Court were to consider the Secretary's acts under the APA, it would find the delegation of authority over American Samoa so broad as to be committed to agency discretion by law and therefore unreviewable pursuant to 5 U.S.C. § 701(a)(2). American Samoa is governed under 48 U.S.C. § 1661(c), which states in relevant part: "[A]ll civil, judicial, and military powers shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct; and the President shall have the power to remove said officers and fill the vacancies so occasioned." Under Executive Order No. 10264, the President transferred this authority to the Secretary of the Interior.

That order states in relevant part that "the Secretary of the Interior shall take such action as may be necessary and appropriate, and in harmony with the applicable law, for the administration of civil government in American Samoa." *Id.,* § 3. This delegation is so broad as to lead the Court to conclude that there is no law available for it to apply, rendering the Secretary's

---

**37.** The Court notes that if it were to conclude the structure of the Samoan court system violates due process because it lacks independent judiciary learned in United States law, it would then be necessary to analyze whether those notions of due process would be impractical or anomalous within the culture of American Samoa. *King v. Morton, supra,* 520 F.2d at 1147, citing *Reid v. Covert,* 354 U.S. 1, 75, 77 S.Ct. 1222, 1260, 1 L.Ed.2d 1148 (1957) (Harlan, J.,

concurring). For example, plaintiff, without explanation, complains the Samoan judiciary is "incompetent." This perhaps refers to the fact that some associate judges are not lawyers, but rather are local matais. Having matais on the court serves the purposes of encouraging popular support for the court's rulings and assuring that the judicial system reconciles western legal concepts with the Fa'a Samoa. *See* Comment, *supra,* at 588–89.

acts unreviewable under the APA. *Heckler v. Chaney,* — U.S. ——, 105 S.Ct. 1649, 1655 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

 If the Secretary's decision here were reviewable, the Court would not find it was arbitrary and capricious, contrary to any constitutional right, or unsupported by substantial evidence. *See* 5 U.S.C. § 706(2). The Secretary provided a reasoned explanation for his refusal to intervene, namely, the United States government's desire to foster autonomy and self-governance in Samoa. *See* Letter from Hodel, *supra,* Def. Hodel's Exh.H. As determined in Part III, *supra,* the Secretary's action did not violate any of plaintiff's constitutional rights. The Secretary's conclusion that the High Court did not clearly abuse judicial discretion is supported on the record by the *Reid* opinions themselves. *See supra,* Part III(A)(2). In sum, plaintiff fails to state a claim under the APA, and Count Five must be dismissed.

## V. CONCLUSION

The Court's jurisdiction over this matter is dependent upon plaintiff's ability to raise a valid federal question. *King v. Morton, supra,* 520 F.2d at 1144. The Court concludes that the decision of the High Court of American Samoa in the case of *Reid v. Puailoa* did not work an unconstitutional taking of plaintiff's property or otherwise offend due process. The Court further concludes that the *Reid* decision did not turn on the application of American Samoa's racially restrictive land ownership statute, and therefore, plaintiff's equal protection claim, and the civil rights claims dependent on it, must fail. The Court further finds that the structure of the court system on American Samoa did not generally nor in this particular case operate to deprive litigants of due process. Finally, the Court concludes plaintiff's claims under the Administrative Procedure Act are unfounded. Therefore, plaintiff has failed to raise a federal or constitutional claim, and

defendants' motions to dismiss will be granted.